# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

——

Argued May 11, 2026          Decided July 17, 2026

No. 25-1163

CLEAN AIR COUNCIL, ET AL.,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY AND LEE M. ZELDIN,
ADMINISTRATOR, U.S. ENVIRONMENTAL PROTECTION
AGENCY,
RESPONDENTS

AMERICAN IRON AND STEEL INSTITUTE, ET AL.,
INTERVENORS

——

Consolidated with 25-1286

——

On Petitions for Review of Final Actions
of the Environmental Protection Agency

——

*Adrienne Y. Lee* argued the cause for petitioners. With her
on the briefs was *James S. Pew*.

*Peter M. Torstensen, Jr.*, Attorney, U.S. Department of Justice, argued the cause for respondents. On the brief were *Adam R.F. Gustafson*, Principal Deputy Assistant Attorney General, *Robert N. Stander*, Deputy Assistant Attorney General, and *Mario A. Luna*, Attorney.

*John D. Lazzaretti* argued the cause for intervenors in support of respondents. With him on the brief was *Lianne Mantione*. *Douglas A. McWilliams* entered an appearance.

Before: RAO, PAN and GARCIA, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* RAO.

RAO, *Circuit Judge*: The Environmental Protection Agency extended the deadlines for steel mills to comply with certain hazardous emission standards. EPA first issued an interim rule and then, after receiving comments, promulgated a final rule. EPA explained the deadline extensions were necessary because problems with the regulatory standards made compliance by the original deadlines technologically infeasible. Several environmental groups petitioned for review.

We conclude that EPA's deadline extensions are consistent with the Clean Air Act and reasonably explained, and petitioners' procedural challenge to the interim rule has been superseded by EPA's promulgation of the final rule.

I.

A.

This case involves emission standards for integrated iron and steel manufacturing facilities, *i.e.*, steel mills. Steel is made in two basic steps. First, molten iron is produced by exposing iron ore to hot, pressurized air in a blast furnace. Next, the

molten iron and other raw materials are blown with oxygen in a basic oxygen process furnace to produce steel. The chemical reactions that take place at both steps generate hazardous air pollutants.

EPA first promulgated maximum achievable control technology ("MACT") standards for steel mills in 2003. *See* 42 U.S.C. § 7412(d)(1)–(2) (directing EPA to set standards that "require the maximum degree of reduction in emissions of … hazardous air pollutants"). As required by the Clean Air Act, EPA set MACT standards for existing steel mills based on the emission levels achieved by the five best performing steel mills. *See id.* § 7412(d)(3)(B). In 2020, EPA completed long overdue reviews of the steel mill standards, concluding that no revisions were necessary.[1] EPA later conducted another review that resulted in the promulgation of additional emission standards. National Emission Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Technology Review, 89 Fed. Reg. 23294 (Apr. 3, 2024) ("2024 Rule").

Three aspects of the 2024 Rule are relevant here. First, EPA established new MACT standards for five previously unregulated sources of hazardous air pollutants generated during steelmaking: unplanned bleeder valve openings, planned bleeder valve openings, bell leaks, slag processing, and beaching. For each standard, EPA set a compliance deadline of one or two years in accordance with the Clean Air Act's requirement that EPA must "provide for compliance as expeditiously as practicable, but in no event later than 3 years

---

[1] Within eight years of setting initial MACT standards, EPA must determine if additional standards are required "to provide an ample margin of safety to protect public health." 42 U.S.C. § 7412(f)(2)(A). EPA must also "review, and revise [the standards] as necessary … no less often than every 8 years." *Id.* § 7412(d)(6).

after the effective date of such standard." 42 U.S.C. § 7412(i)(3)(A). Second, EPA revised the method and frequency for measuring furnace emissions and set a one-year compliance deadline. Finally, EPA imposed a fenceline monitoring requirement for testing chromium emissions along facility perimeters. Because EPA had not yet promulgated a test method, the compliance deadline for fenceline monitoring was set to one year after the promulgation of a test method or two years after the promulgation date of the 2024 Rule, whichever comes later.

B.

In June 2024, environmental groups and steel companies petitioned EPA for reconsideration of the 2024 Rule. The Clean Air Act ordinarily requires that objections to a rule be raised during the public comment period. 42 U.S.C. § 7607(d)(7)(B). But if a person can show that "it was impracticable to raise [an] objection within such time or if the grounds for such objection arose after the period for public comment … and if such objection is of central relevance to the outcome of the rule," then EPA "shall convene a proceeding for reconsideration of the rule." *Id.* While such reconsideration does not automatically "postpone the effectiveness of the rule," the rule "may be stayed during such reconsideration … for a period not to exceed three months." *Id.*

EPA responded to the petitions in August 2024, explaining that none of the issues raised required reconsideration. EPA stated it would nonetheless revisit some aspects of the 2024 Rule and would fix technical errors through a corrections notice. In light of the complex data involved, EPA explained that it would continue to evaluate whether other aspects of the 2024 Rule warranted revision.

After a change in presidential administrations, EPA responded again to the petitions, announcing it had identified several issues requiring reconsideration under the Clean Air Act and would continue to assess whether there might be others. EPA issued a 90-day stay pending reconsideration of all MACT standards promulgated under the 2024 Rule with year-2025 compliance deadlines.

EPA then promulgated an interim final rule extending several compliance deadlines in the 2024 Rule. National Emission Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Technology Review: Interim Final Rule, 90 Fed. Reg. 29485 (July 3, 2025) ("Interim Rule"). Citing compliance challenges, EPA extended the 2025 and 2026 deadlines for unplanned and planned bleeder valve openings, bell leaks, slag processing, beaching, and furnace emission monitoring to April 3, 2027. EPA also updated the fenceline monitoring deadline to the later of April 3, 2027, or one year after promulgation of a test method.

EPA relied on the "good cause" exception to notice and comment to issue the Interim Rule. That exception allows EPA to forgo notice and comment "when the agency for good cause finds … that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B); 42 U.S.C. § 7607(d)(1) (preserving this exception within the Clean Air Act's judicial review scheme). EPA determined that notice and comment procedures would be impracticable because several of the deadlines were imminent and steel mills would be unable to comply. EPA did, however, request comment on the revised compliance deadlines imposed by the Interim Rule.

Five environmental advocacy groups petitioned for review of the Interim Rule, raising procedural and substantive

challenges. After the petitioners filed their opening brief, EPA issued a final rule that responded to comments on the Interim Rule and reaffirmed the extended compliance deadlines. National Emission Standards for Hazardous Air Pollutants: Integrated Iron and Steel Manufacturing Facilities Technology Review, 90 Fed. Reg. 55681 (Dec. 3, 2025) ("Final Rule"). For each extended deadline, EPA explained that errors in the 2024 Rule or new information showed that compliance would be significantly more difficult than expected. For fenceline monitoring, EPA affirmed that no test method had yet been promulgated and that it was updating the deadline for consistency with the other revisions.

Petitioners sought review of the Final Rule, and we consolidated that petition with the petition for review of the Interim Rule. Two steel companies and a trade association intervened to defend the new deadlines.[2] We have statutory subject matter jurisdiction over the petitions under 42 U.S.C. § 7607(b)(1).

## II.

Although neither EPA nor intervenors contest the point, we confirm that petitioners have standing to invoke this court's jurisdiction.[3] Petitioners are five environmental nonprofits with

---

[2] Other petitions challenging the new MACT standards in the 2024 Rule have been held in abeyance while EPA continues to review those standards. *See* Order, *Am. Iron & Steel Inst. v. EPA*, No. 20-1354 (D.C. Cir. June 22, 2026) (ordering the consolidated cases continue to be held in abeyance).

[3] We also confirm intervenors' standing. Under this circuit's precedents, "Article III standing is a prerequisite to intervention, even as a respondent." *IGas Holdings, Inc. v. EPA*, 146 F.4th 1126, 1135 n.2 (D.C. Cir. 2025). *But see Institutional S'holder Servs., Inc. v. SEC*, 142 F.4th 757, 764 n.3 (D.C. Cir. 2025) (recognizing that our

members who live and work near steel mills subject to the 2024 Rule's emission standards. To demonstrate associational standing, at least one of the petitioners must show that (1) one or more of its members would have standing to sue in his or her own right; (2) the interests the association seeks to protect are germane to its purpose; and (3) neither the claim asserted nor relief requested requires individual members to participate in the lawsuit. *Int'l Dark-Sky Ass'n, Inc. v. FCC*, 106 F.4th 1206, 1217 (D.C. Cir. 2024).

Petitioners submitted ten declarations to support their standing, including one declaration from an individual member of each organization. According to the declarations, petitioners' members experience specific adverse health symptoms, as well as recreational, aesthetic, and other harms, attributable to pollution from steel mills. *See, e.g.*, Abeyta Decl. ¶¶ 1, 9–12 (Clean Air Council member describing respiratory symptoms and curtailed activities due to pollution from a nearby steel mill); Ballinger Decl. ¶¶ 2, 11–12 (similar declaration from Sierra Club member). Petitioners' members aver that delaying the compliance deadlines for the 2024 Rule's emission standards exacerbates these harms.

---

cases requiring intervenors to show standing even when seeking the same relief as an existing party are in tension with *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2379 n.6 (2020)). Intervenors are the two parent companies of the eight steel mills regulated by the 2024 Rule and a trade association of steel producers, of which one of the two companies is a member. Because the two companies are directly regulated by the relevant rules, they have standing to intervene as respondents. *See IGas Holdings*, 146 F.4th at 1135 n.2. The industry association likewise has standing because at least one of its members is directly regulated. *Id.*

Under our environmental standing precedents, this is sufficient to demonstrate standing. In the 2024 Rule, EPA found that the new emission standards would "improve air quality and the health of persons living in surrounding communities." 89 Fed. Reg. at 23315. Because petitioners' members face exposure to the harms the standards would mitigate, petitioners have alleged concrete and particularized injuries traceable to EPA's decision to delay the compliance deadlines. *See Air All. Houston v. EPA*, 906 F.3d 1049, 1058–59 (D.C. Cir. 2018) (per curiam) (holding that an association had standing to challenge EPA's delay of a rule's effective date because the delay exposed members to "a higher risk of … harms than would exist" if the rule "became effective on time").

The other two associational standing requirements are likewise satisfied. As to germaneness, the petitioners' declarations credibly connect their claims to their environmental purposes, which include protecting the public from toxic air pollution. *See, e.g.*, Fox Decl. ¶ 6 (stating Clean Air Council "is dedicated to protecting … everyone's right to breathe clean air"); Isherwood Decl. ¶ 8 (stating "Sierra Club has dedicated itself to protecting public health and its members from … toxic air pollution"). And no individual member need participate as a named petitioner in the lawsuit. The petitions challenge the lawfulness of the Interim and Final Rules and seek to vacate them, so "[n]either the legal claims nor the relief sought involve individual grievances." *Int'l Dark-Sky Ass'n*, 106 F.4th at 1218. The petitioners have established associational standing.

## III.

Petitioners challenge EPA's revised compliance deadlines, arguing that they are inconsistent with the Clean Air Act and

unreasonable. Because the Final Rule reaffirmed the deadlines in the Interim Rule and petitioners' substantive challenges are applicable to both rules, we focus our analysis on the Final Rule. *See Ass'n of Am. Physicians & Surgeons v. Sebelius*, 746 F.3d 468, 473 (D.C. Cir. 2014) (not reaching substantive challenges to an interim rule after rejecting such challenges to a subsequent final rule because "it is clearly preferable as a general matter to review a set of claims in the context of an extant rather than a defunct rule").

The Clean Air Act specifies the grounds for judicial review of certain EPA rules. *See* 42 U.S.C. § 7607(d)(9). Review is "essentially the same as judicial review under the [Administrative Procedure Act ("APA")]." *U.S. Sugar Corp. v. EPA*, 113 F.4th 984, 991 n.7 (D.C. Cir. 2024) (per curiam) (cleaned up). Challenges to the scope of EPA's authority under the Clean Air Act are reviewed de novo. *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2261 & n.4 (2024). And under the APA's familiar standard for arbitrary and capricious review, we consider whether EPA has examined the "relevant data and articulate[d] a satisfactory explanation for its action including a rational explanation of the facts found and the choice made." *Air Alliance*, 906 F.3d at 1066 (cleaned up).

Applying these standards, we hold the revised compliance deadlines are consistent with the Clean Air Act and reasonably explained.

## A.

Petitioners argue that EPA lacked authority to use rulemaking to extend the compliance deadlines because the extensions are incompatible with the Clean Air Act's three-month limit on stays pending reconsideration.

The Act permits EPA to stay a rule's effectiveness for up to three months pending "reconsideration" in light of objections that could not have been raised earlier and that are "of central relevance" to the rule. 42 U.S.C. § 7607(d)(7)(B). In *Air Alliance*, we held that EPA lacks authority to use general rulemaking authority to extend a rule's effective date beyond three months "for the purposes of reconsideration under that provision." 906 F.3d at 1061. A rule that extended a regulation's effective date by 20 months was accordingly unlawful because the "only justification" EPA gave was that it needed more time to "consider petitions for reconsideration … and take further regulatory action, as appropriate." *Id.* at 1060–61 (cleaned up). Petitioners maintain that EPA's decision to revise the 2024 Rule's compliance deadlines beyond three months similarly exceeds EPA's authority.

The Final Rule's deadline extensions are consistent with the Clean Air Act's specific time limit on stays pending "reconsideration." When EPA is delaying a rule's effectiveness merely to conduct proceedings to resolve issues raised in a reconsideration petition, it must abide by the three-month limit. Applying this provision in *Air Alliance*, we vacated an effective date extension rule because EPA relied solely on the need for more time for reconsideration, without making any substantive findings as to why a delay was required. *Id.* at 1063–65.

By contrast, in the Final Rule EPA delayed the compliance deadlines because of specific technical issues that undermined the ability of steel mills to comply. *See* Part III.B, *infra*. This is a proper exercise of EPA's regulatory authority, which allows EPA to establish compliance deadlines for hazardous emission standards. *See* 42 U.S.C. § 7412(d)(1) (authorizing EPA to "promulgate regulations establishing emission standards for each category or subcategory of major sources"); *id.*

§ 7412(i)(3)(A) (requiring EPA to "establish a compliance date or dates" for emission standards "for each category or subcategory of existing sources"). The Clean Air Act requires EPA to establish deadlines that provide for compliance "as expeditiously as practicable," and here, unlike in *Air Alliance*, EPA made findings that the existing compliance deadlines were not practicable. *Id.* § 7412(i)(3)(A). Neither the statute nor *Air Alliance* precludes EPA from setting new compliance deadlines pursuant to this regulatory authority.

Petitioners also argue that, even if EPA had authority to extend the compliance deadlines, any acknowledgement by EPA that it intended to revise the 2024 Rule's substantive standards renders the new deadlines arbitrary and capricious because that is not a factor EPA is permitted to consider. Petitioners point to EPA's statement in the Interim Rule that it was revising the deadlines "to allow sufficient time to address the issues" teed up by the reconsideration petitions "and to allow sufficient time for compliance in light of the new data and information presented" to EPA. 90 Fed. Reg. at 29489.

Even if EPA relied in part on needing more time to revise the relevant standards, EPA made clear that compliance challenges were a necessary and sufficient reason for extending the deadlines. Throughout the Interim and Final Rules, EPA explicitly stated it was delaying the deadlines because of specific compliance challenges. *See, e.g.*, Interim Rule, 90 Fed. Reg. at 29485 ("EPA is revising certain compliance deadlines … in light of serious concerns that facilities will be unable to comply with the relevant requirements by the existing deadlines."); Final Rule, 90 Fed. Reg. at 55683 ("[T]he compliance deadlines were revised for each standard based on the unique compliance challenges presented in practice by each standard."). The fact that EPA also candidly referred to ongoing efforts to update the 2024 Rule does not render the

new deadlines arbitrary and capricious. *See Fontem US, LLC v. FDA*, 82 F.4th 1207, 1217 (D.C. Cir. 2023) (recognizing that, when an agency invokes multiple grounds for a decision, the decision may be upheld so long as valid reasons provide a "sufficient basis" for the decision).

The Clean Air Act's reconsideration provision does not swallow EPA's other regulatory authorities to change compliance deadlines. In the Final Rule, EPA properly relied on these authorities by offering specific, technological reasons why it would be impracticable for steel mills to comply with the deadlines in the 2024 Rule. That approach is not an impermissibly long "reconsideration," but rather an exercise of EPA's regulatory authority over setting and implementing hazardous emission standards.

B.

For their remaining substantive challenges, petitioners argue that EPA set unreasonable deadlines and did not explain how the deadlines "provide for compliance as expeditiously as practicable." 42 U.S.C. § 7412(i)(3)(A). We hold the deadline extensions are reasonably explained and consistent with the statutory requirement.

1.

The Clean Air Act requires EPA to set deadlines for existing sources to comply with MACT standards "as expeditiously as practicable, but in no event later than 3 years after the effective date of such standard." 42 U.S.C. § 7412(i)(3)(A). A standard is "practicable" if it is "[c]apable of being put into practice, carried out in action, effected, accomplished, or done." *Practicable*, Oxford English Dictionary (2d ed. 1989). For each of the MACT standards in the 2024 Rule, EPA relied on information showing that

compliance would be significantly more difficult than anticipated. These determinations about how much time steel mills will require for expeditious compliance are squarely within EPA's expertise to make predictive judgments about the implementation of the 2024 Rule. *See Bd. of Cnty. Comm'rs v. U.S. Dep't of Transp.*, 955 F.3d 96, 99 (D.C. Cir. 2020) (recognizing "courts are not well equipped to second-guess" agencies' predictive judgments within their expertise). Based on these findings, EPA reasonably and lawfully extended the deadlines to three years after the 2024 Rule's promulgation date.

We first evaluate the three standards with one-year compliance deadlines: planned bleeder valve opening opacity limits, bell leak work practice standards, and furnace monitoring frequency. As EPA explained, the one-year deadlines rested on an assumption that steel mills could comply with these standards without installing new equipment. Technical issues identified after the 2024 Rule was promulgated, however, undermined that assumption.

For planned bleeder valve openings, the 2024 Rule imposed an opacity limit of eight percent for existing steel mills. A bleeder valve is a device used to release pressure from a blast furnace, either deliberately by an operator (a planned opening) or automatically because of a pressure buildup (an unplanned opening). Opacity is a measure of how much light is blocked or absorbed by visible air pollution—a proxy for hazardous pollutants—where a lower value corresponds to less pollution. Opacity readings are taken by certified observers in person or based on camera images. When a bleeder valve opens, an opacity reading of the surrounding air will indicate the amount of pollution released.

14

EPA gave two reasons why the eight percent opacity limit for planned bleeder valve openings rendered compliance in one year impracticable. First, the 2024 Rule set the limit based only on data from planned openings with at least two hours of lead time, for which operators have an opportunity to mitigate emissions. The 2024 Rule, however, requires all openings initiated by an operator to comply with this limit, even when there is little or no lead time. This means operators may not have an opportunity to mitigate emissions or enough time to take an opacity reading. Second, the 2024 Rule relied on data from the best performing steel mills. But that data turned out to be incomplete, and additional data from one such facility demonstrated higher opacity at that facility. EPA reasonably concluded that it "likely will be infeasible for most sources to comply" with the opacity limit, which had been set based on unrepresentative data. Final Rule, 90 Fed. Reg. at 55685.

EPA reached a similar conclusion with respect to the compliance deadline for bell leak standards. A bell is a device at the top of a blast furnace that prevents gases from escaping as raw materials are added, and the bell seal is the part of the bell that keeps the furnace airtight. The 2024 Rule established a schedule for testing and replacing bell seals every time a small bell releases a visible emission or when a large bell consistently exceeds an opacity threshold. EPA subsequently received new information, including that even new bells could produce visible emissions, which showed that the 2024 Rule would require more frequent and operationally disruptive testing and seal replacements than anticipated. EPA reasonably determined that steel mills "would likely be unable to comply with the [bell leak] standards" by the original deadline. *Id.*

EPA likewise concluded that steel mills could not comply with the 2024 Rule's requirement for furnace monitoring by the original deadline. The 2024 Rule required steel mills to take

opacity readings from more locations at the structures housing the blast furnaces and basic oxygen process furnaces. The regulatory text required that readings be "made separately at each [structure] opening." 2024 Rule, 89 Fed. Reg. at 23324. The preamble to the 2024 Rule, however, set forth a different approach and allowed steel mills to take readings from the one opening with the highest opacity. After considering information about the difficulty of taking simultaneous readings as required by the regulatory text, EPA reasonably concluded that the ambiguity about how to measure furnace emissions justified the extended deadline "given the need for sources and the EPA to work through how compliance will be achieved." J.A. 840 (response to comments).

We next assess the three standards with two-year compliance deadlines: unplanned bleeder valve opening operational limits, slag processing opacity limits, and beaching work practices. EPA explained that the two-year deadlines rested on an assumption that facilities would need to make only modest changes in equipment or operations to comply. EPA identified problems with this assumption and reasonably extended the compliance deadlines.

The 2024 Rule capped the total number of unplanned bleeder valve openings. EPA based the limit on the highest number of unplanned openings observed at the five best performing steel mills. But the 2024 Rule based the limit on unplanned openings observed only for bleeder valves not routed through an emission-control device. Because the 2024 Rule counted all unplanned openings towards the limit, including those that are routed through a control device, EPA concluded that the limit is "unachievable until a revision is made."[4] Final Rule, 90 Fed. Reg. at 55685. The 2024 Rule also

---

[4] To the extent EPA determined that the operational limit for unplanned bleeder valve openings (or any other standard) would be

specified work practices for reducing emissions from unplanned openings, including requiring steel mills to install monitoring devices. But EPA later received information showing that these work practices would be insufficient to achieve compliance with the operational limit or infeasible to implement. Relying on this information, EPA reasonably concluded that some steel mills "likely will need more than two years to comply" with the unplanned bleeder valve standard. *Id.*

Similarly, for slag processing and handling, the 2024 Rule imposed an opacity limit of ten percent. Slag is a furnace waste product that is placed in open pits to cool before removal. Moving slag releases particulate matter into the air. The ten percent limit rested on EPA's understanding that this level was achievable using work practices described in the 2024 Rule. After the rulemaking, however, EPA received data showing the opacity measurements EPA relied on were erroneously low, as well as information showing that the new work practices might be ineffective, unsafe, and contribute to high opacity readings. EPA reasonably concluded that some steel mills "likely will need more than two years" to comply with the opacity limit given the incompatibility between the work practices and lowering the opacity levels. *Id.* at 55686.

Finally, the 2024 Rule required work practices for mitigating beaching emissions. Beaching occurs when molten iron from a blast furnace is dumped on the ground because it

---

impracticable to comply with on any timeline, EPA's deadline revisions are nonetheless consistent with the Clean Air Act. The Act's three-year limit on compliance deadlines contemplates situations where expeditious compliance cannot be achieved in three years or less. *See* 42 U.S.C. § 7412(i)(3)(A). It was reasonable and consistent with the statute for EPA to extend the deadlines without exceeding the statutory maximum.

cannot be loaded into the basic oxygen process furnace. The 2024 Rule required steel mills to have enclosures for beaching or use carbon dioxide to suppress fumes emitted as the molten iron cools. After the rulemaking, EPA was made aware that some facilities would need to relocate where beaching takes place in order to build enclosures or install suppression systems, assuming these work practices could be implemented at all. EPA reasonably concluded that steel mills would need more than two years to make these changes.

In the Final Rule, EPA relied on specific concerns raised in the reconsideration petitions and post-Interim Rule comments and identified technical challenges that demonstrated compliance would be impracticable by the original deadlines. EPA did not need to use magic words to explain that the new deadlines would "provide for compliance as expeditiously as practicable." 42 U.S.C. § 7412(i)(3)(A). The agency's analysis makes clear that compliance would not be practicable in under three years. *See Constellation Mystic Power, LLC v. FERC*, 45 F.4th 1028, 1055 (D.C. Cir. 2022) ("Ordinarily, we will uphold an agency decision where the agency's path may be reasonably discerned, even if the decision is of less than ideal clarity.") (cleaned up). Because EPA was required to set a deadline, it was reasonable for EPA to set the compliance period for three years.[5] We accordingly hold that the deadline extensions were reasonable and consistent with the Clean Air Act.

2.

Petitioners' last substantive challenge is to the fenceline monitoring deadline. The 2024 Rule required compliance with

---

[5] EPA extended the deadlines to three years after the 2024 Rule's April 3, 2024, promulgation date. The new deadlines are just within three years of the 2024 Rule's June 3, 2024, effective date.

the fenceline monitoring requirement within one year after the promulgation of a testing method or two years after promulgation of the 2024 Rule, whichever came later. EPA updated that deadline to the later of one year after promulgation of a testing method or April 3, 2027. Because the record before us does not indicate that EPA promulgated a testing method by April 3, 2026, steel mills must comply with the fenceline monitoring requirement within one year of when EPA eventually promulgates a testing method under both the 2024 Rule and the new deadline. We do not address the substantive reasonableness of the fenceline monitoring deadline because with the passage of time the deadline under the 2024 Rule and the Final Rule is the same. There is accordingly no meaningful relief we can give by setting aside the new fenceline monitoring deadline.

IV.

That leaves petitioners' procedural challenge to the Interim Rule. Petitioners argue the Interim Rule is procedurally invalid because EPA lacked good cause to forgo notice and comment. This challenge is now moot. Even assuming EPA lacked good cause for the Interim Rule, we could provide no meaningful relief for that alleged defect because EPA later promulgated the Final Rule after notice and comment.

The normal remedy for a claim that an agency failed to follow rulemaking procedures is to give the agency "an opportunity to correct the procedural defect and promulgate a new rule." *Georgetown Univ. Hosp. v. Bowen*, 821 F.2d 750, 758 (D.C. Cir. 1987). It is undisputed that EPA followed those procedures in promulgating the Final Rule, which affirmed the deadlines and EPA's reasoning in the Interim Rule. *See Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2386 & n.14 (2020) (holding that an agency's

"request for comment" in an interim final rule "satisfies the APA's rulemaking requirements").

Under these circumstances, petitioners have nothing to gain from a decision vacating the Interim Rule.[6] This is especially true because we have rejected petitioners' substantive challenges to the Interim and Final Rules. Procedural challenges to rules are moot if the agency has promulgated the same rule after following the required procedures. *See Ass'n of Am. Physicians & Surgeons*, 746 F.3d at 472–73 (dismissing a procedural challenge to an interim final rule because it was "superseded by a rule promulgated after notice and comment"); *Nat. Res. Def. Council, Inc. v. U.S. Nuclear Regul. Comm'n*, 680 F.2d 810, 813–14 (D.C. Cir. 1982) (dismissing a procedural challenge due to the agency's "repromulgation of the rule after providing notice and opportunity for comment"). We therefore dismiss petitioners' procedural challenge to the Interim Rule.

\* \* \*

We dismiss petitioners' challenge to the fenceline monitoring deadline and their procedural challenge to the Interim Rule. We otherwise deny the petitions for review

---

[6] Petitioners attempt to resist this straightforward conclusion by pointing to *American Maritime Association v. United States*, 766 F.2d 545 (D.C. Cir. 1985). In that case, we declined to dismiss a challenge to an interim final rule notwithstanding the issuance of a final rule because the substantive legal challenges were "equally applicable to the final rule and the interim rule." *Id.* at 554 n.14; *see also Clean Fuels All. Am. v. EPA*, 169 F.4th 307, 311–12 (D.C. Cir. 2026) (discussing *American Maritime*). The proposition is plainly of no support to petitioners' procedural challenge, which they assert only with respect to the Interim Rule and not the Final Rule.

because EPA's revised deadlines for steel mill emission standards are reasonable and consistent with the Clean Air Act.

*So ordered.*